# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs January 18, 2012

## STATE OF TENNESSEE v. ANTONIO D. ALEXANDER

**Direct Appeal from the Circuit Court for Rutherford County**
**No. F-64676      Don R. Ash, Judge**

---

**No. M2010-02485-CCA-R3-CD - Filed May 23, 2012**

---

The Defendant-Appellant, Antonio D. Alexander, was convicted by a Rutherford County jury of attempted aggravated robbery, especially aggravated kidnapping, second degree murder, first degree felony murder, especially aggravated robbery, and reckless endangerment committed with a deadly weapon.  The jury sentenced Alexander to life without the possibility of parole for the first degree felony murder conviction, and the trial court sentenced him to a consecutive ninety-year sentence for the remaining convictions.  On appeal, Alexander argues:  (1) the evidence was insufficient to support his convictions; (2) the jury erred in unanimously finding the State had proven beyond a reasonable doubt the existence of the aggravating circumstance that "[t]he defendant knowingly created a great risk of death to two (2) or more persons, other than the victim murdered, during the act of murder";  and (3) the trial court erred in imposing an excessive sentence.  Upon review, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which  JAMES CURWOOD WITT, JR., J., joined and JERRY L. SMITH, J., not participating.

Barry R. Tidwell, Murfreesboro, Tennessee, for the Defendant-Appellant, Antonio D. Alexander.

Robert E. Cooper, Jr., Attorney General and Reporter; Lindsy Paduch Stempel, Assistant Attorney General; William C. Whitesell, Jr., District Attorney General; and J. Paul Newman and Trevor H. Lynch, Assistant District Attorneys General, for the Appellee, State of Tennessee.

## OPINION

**Trial.**  On February 2, 2008, Sean Mahoney was bartending at the O'Charley's restaurant in Murfreesboro, Tennessee.  At midnight, Mahoney clocked out and left the restaurant through the back door.  Mahoney saw that there were only a few cars in the restaurant's parking lot, and he walked directly to his car, which was parked near the back door.  He got into his car and called his girlfriend on his cell phone, but before his girlfriend could answer, Alexander knocked on Mahoney's window.  Alexander, who was wearing a blue ski mask and blue coveralls so that he would not be identified, told Mahoney to hang up his phone because he was robbing him.  He then told Mahoney to get out of the car, but Mahoney refused to comply.  Alexander then brandished a .22 caliber revolver and told him, "Look at this gun.  Do you think I'm joking now?"  Mahoney said that Alexander "wasn't very aggressive" but he "tried to keep him calm" because he was "scared."  He added, "[w]ithout even robbing me[, Alexander] decided that he wanted to go inside [the restaurant] and told me to take him inside."

When Alexander walked towards the front door of the restaurant, Mahoney told him that the only way to get inside the restaurant at that time of night was through the door to the kitchen.  Alexander then put a gun to Mahoney's back and ordered him to walk around to the kitchen door on the other side of the restaurant.

When they approached the door to the kitchen, Alexander stood against the wall so that he would not be seen through the door's peephole as Mahoney rang the buzzer.  Another employee, Michael Dorton, saw Mahoney and opened the door.  As the door swung open, Dorton saw Alexander in a ski mask and coveralls and said, "I see we have a situation here." Alexander responded, "Yeah, we do," and pulled out the .22 caliber revolver.  Dorton then called out to Nadar Bahmanziari, the O'Charley's manager, "Hey, Nadar, man, we've got a situation here."  Mahoney quickly ran into the manager's office, where Bahmanziari was sitting, and pulled Dorton into the office with him.  Mahoney and Dorton were unable to completely close and lock the Dutch-style door to the manager's office behind them because Alexander was struggling to open it.

Bahmanziari had been counting the receipts for the day at the moment that Mahoney and Dorton ran into his office. Mahoney informed Bahmanziari that Alexander was robbing them and told him to call 9-1-1, which he did.  When Alexander started kicking or hitting the door, Mahoney wedged himself between the door and the floor safe in an attempt to keep the door closed.  Mahoney said that the top and the bottom sections of the door were opening at different times and that he could not get them both closed at the same time to "latch it shut." At that point, Alexander began repetitively screaming, "Open the door. Give me the money." He then screamed, "Open the mother f[------] door or I'm going to bust.  If you don't open the door now I'm going to bust.  I'm telling you open the f[------] door or I'm going to bust."

-2-

Alexander then fired two gunshots. He was standing when the fired the first shot, and this bullet did not penetrate the door to the office. Alexander then crouched down and looked through the gap between the top and bottom sections of the Dutch door and fired a shot through this gap into the office. Bahmanziari was hit by this bullet and fell out of his chair onto the floor.

Dorton dragged Bahmanziari into the office's closet, for which only he had a key, and shut the door behind them. Once Dorton and Bahmanziari were safely inside the office's closet, Mahoney opened the door and allowed Alexander to enter the office, where he stole $2700 in cash before fleeing the scene.

After Mahoney determined that Alexander had left the scene, he checked on Bahmanziari and Dorton. At that point, Bahmanziari was bleeding profusely and looked very pale. Mahoney described the perpetrator to the 9-1-1 dispatcher as an African-American male wearing blue coveralls and a blue ski mask who was taller than 5'10" and weighed between 300 and 350 pounds. Dorton described the perpetrator as an African-American male wearing coveralls and a ski mask. Dorton stated that the coveralls "appeared to be brand new" and fit the perpetrator "[v]ery tightly." Lester Hollins, a dishwasher at O'Charley's the night of the incident, stated that the perpetrator "had on a dark blue ski mask with overalls that looked like they would be something that a mechanic would wear, an auto mechanic, but not of the same color[.]" Hollins stated that the coveralls were not dark blue but were light blue in color. He stated that the perpetrator was an African-American male of light skin, and he based this physical description on the fact that he could "see around [the perpetrator's] neck area, around the eyes and the wrist area where the sleeve of the coveralls stopped." Finally, Corey Simmons, a cook at O'Charley's the night of the incident, described the perpetrator as "a masked guy, big guy[.]" Simmons also stated that the perpetrator was six feet tall and weighed "well over 250" pounds. He also said that the perpetrator was wearing a ski mask, coveralls, and gloves and described the as coveralls as "beige maybe. A neutral color."

The Murfreesboro Police Department responded to the scene. During the investigation, Officer David Miller discovered a gray van parked near the side entrance of the restaurant that did not belong to any of the employees. Officer Miller touched the hood of the van, which felt warm. He then looked through the van's windows and saw Alexander's International Paper identification badge in the center console. After providing the license tag of the van to dispatch, he discovered that the van belonged to Alexander and his wife, Edrita Alexander.

Officer Gary Schoon of the Smyrna Police Department subsequently drove to Alexander's home to obtain additional information about the van that was parked in the O'Charley's parking lot. Edrita Alexander answered the door and, pursuant to her husband's

instructions, lied and claimed that she had become sick and had left the van at the restaurant. At approximately 12:50 a.m., Officer Schoon telephoned Edrita Alexander to ask her what time she left the van at the restaurant, and she told him that she left the van behind the restaurant at 10:00 p.m. on February 2, 2008.

Edrita Alexander subsequently consented to a search of the van. Detective Richard Presley recovered Antonio Alexander's work identification from the van. He also discovered several pairs of gloves and several earplugs in the back of the van. In addition, he discovered a wallet containing Alexander's driver's license in the front passenger seat as well as a stocking mask and an earplug in the van.

Alexander became the primary suspect in the crime based on the evidence retrieved from the crime scene. The general description of the perpetrator was that he was approximately six feet tall and of large build. Alexander's driver's license showed that he was 5'11" and weighed around 300 pounds.

At sunrise, Officer Bryan Anderson walked to the back of the restaurant parking lot and discovered that the privacy fence separating the restaurant from Maple Street had a missing picket. As he looked through the fence, Officer Anderson saw a footprint on the ground on the other side of the fence. When Officer Anderson called a detective over to see the footprint, he noticed a $50 bill twenty to forty feet from the footprint. After examining the area on the other side of the fence, Officer Anderson observed a trail of bills which led to a large, white, unoccupied house at 1111 North Maple Street that was undergoing a renovation.

Additional bills were found in the backyard of this house. When officers discovered a side door wide open, they entered the house. They observed footprints on the first floor, on the stairs, and next to a bathtub. The footprints inside the house had markings that were consistent with the footprint seen next to the fence at the restaurant. In an upstairs bedroom closet, the officers found a pair of large, dark coveralls on the floor. They also found an earplug in a pocket of the coveralls. In addition, the officers found a pair of gloves in a bathroom in the house. The earplugs, gloves, and coveralls were the same type as those provided by Alexander's employer, International Paper. Shortly after the initial search of the home on North Maple Street, a construction supervisor informed the police that a loaded .22 caliber revolver had fallen from the top of a closet as he was doing duct work.

At trial, Mahoney and Dorton identified pictures of the coveralls and handgun that were retrieved from the house at 1111 North Maple Street and confirmed that the perpetrator wore identical coveralls and fired an identical gun at the time of the incident. Another O'Charley's employee, Cory Simmons, also identified a picture of the handgun and gloves

recovered from 1111 North Maple Street and confirmed that the perpetrator fired an identical gun and wore identical gloves at the time of the incident.

Shortly after the incident on February 3, 2008, Alexander telephoned his wife and instructed her to tell officers that she had parked the van at the back of the O'Charley's restaurant and had called a friend, Leon Moton, to pick her up when she got sick. Alexander also telephoned his girlfriend, Veronica Hines, after the incident to ask for her help. Hines left her date to help Alexander, but he did not telephone her again until 7:00 a.m., when he asked her to pick him up at the corner of Jackson Street and North Academy Street in Murfreesboro. Hines picked up Alexander and took him back to her apartment before driving him to the home of Leon and Tashala Moton, where Alexander changed his clothes. When they returned to Hines's apartment, Alexander asked her to take him back to Leon Moton's house, which she did. Alexander contacted Hines several days after the incident and instructed her to tell the police that she had taken him home the morning of February 3, 2008, which she did. He later told her to tell the police that they had been together at the time of the incident at O'Charley's, but she refused.

Leon Moton, who also worked at International Paper, and Alexander were friends. At 9:00 a.m. on February 3, 2008, Alexander, who was with Hines, knocked on the door to Leon and Tashala Moton's door. When Tashala opened the door, Alexander asked to speak with Leon. Tashala Moton recognized Hines because Hines had previously accompanied Alexander to an International Paper function. Leon walked out to the front porch to speak with Alexander, and Alexander asked Leon to tell his wife, Edrita, that Alexander had been with him the previous night. A few minutes later, Alexander asked Leon to give him a change of clothes so he would not smell like perfume when his wife saw him. Leon agreed to help Alexander and gave him some pants and a pair of shoes, and Alexander immediately changed into these clothes, leaving the clothes he had been wearing at Leon's house. Leon later threw Alexander's clothes and shoes into the dumpster across the street from his house.

After changing his clothes, Alexander left Leon's house but returned approximately ten to fifteen minutes later. Upon his return, Alexander asked Leon to drive him to his sister's house in Smyrna, where he would meet his wife, Edrita, and Leon agreed. As they were driving to Smyrna, Leon agreed to tell Edrita that he and Alexander had been gambling the previous night, which was why Alexander did not come home the night of February 2, 2008. When they arrived in Smyrna, Leon told Edrita that they had been out gambling the previous night. Alexander later told Leon to tell the police that Leon had picked up Alexander's wife at the O'Charley's restaurant on February 2, 2008, between 10:00 p.m. and 11:00 p.m.

When the police contacted Leon Moton, he admitted that he and Alexander did not go gambling the night of February 2, 2008 and that he and Alexander had fabricated this

story to explain why Alexander did not come home to his wife that night. Leon also acknowledged that the story about him picking up Alexander's wife at the restaurant on the night of February 2, 2008, was not true. He then told the police that he had thrown Alexander's clothes into the dumpster across the street from his house.

Agent James Davis of the Tennessee Bureau of Investigation (TBI), an expert in the field of gunshot residue analysis, testified that the gunshot residue recovered from the gap in the Dutch-style door was consistent with someone firing a .22 caliber revolver through the gap in the door. Agent Linda Littlejohn of the TBI, an expert in the area of micro analysis, testified that the shoe prints collected from the house on North Maple Street matched Alexander's shoes collected from the dumpster across the street from Leon Moton's house. Agent Teri Arney of the TBI, an expert in the field of firearms identification, testified that the .22 caliber revolver found at the house on North Maple Street contained two fired and six unfired cartridge cases. In addition, she stated that the bullet recovered from the door at O'Charley's restaurant and the bullet recovered from the victim had characteristics that were consistent with the cartridges in the .22 caliber handgun found at the house on North Maple Street. Agent Arney also stated that the two bullets had the same caliber and rifling characteristics as bullets fired from a .22 caliber revolver. Agent J.E. Reid of the TBI, an expert in the field of fingerprint comparison and identification, testified that she was unable to obtain any latent fingerprints on the revolver recovered from the house on North Maple Street.

Agent Patrick Ihrie of the TBI, an expert in DNA analysis and serology, examined the pants and shoes recovered from the dumpster as well as the coveralls, the earplug in the coveralls, and the gloves that were recovered from the house on North Maple Street. DNA analysis showed that the pants and shoes from the dumpster as well as the coveralls and gloves recovered from the house on North Maple Street contained Alexander's DNA. Moreover, Alexander could not be excluded as the contributor of the partial DNA profile obtained from the earplug found in the pocket of the coveralls.

Alexander and his wife voluntarily appeared at the Murfreesboro Police Department on February 3, 2008. After signing a waiver of his Miranda rights, Alexander was interviewed by Officer James Abbott and Major Jim Gage on February 3, 2008 at 11:30 a.m. At the time of this interview, Alexander was a person of interest based on the evidence collected at the crime scene. During this interview, Alexander claimed that his wife had parked the van at O'Charley's between 10:30 p.m. and 11:00 p.m. on February 2, 2008, and that Leon Moton had picked her up and taken her home because she was not feeling well. He also told the police that he owned coveralls like those described by the victims but that they were too small and he had left them at work. Alexander also claimed that Hines had picked him up on Bridgewater Street in Smyrna at 11:15 p.m. on February 2, 2008, and that he had stayed with her until 9:00 a.m. the next morning.

Sadly, Bahmanziari died a short time after the shooting. The gunshot wound to his abdomen was the cause of his death.

**Sentencing Hearings.** At the July 26, 2010 sentencing hearing for the first degree felony murder conviction, the jury found that the State had proven the following statutory aggravating circumstances beyond a reasonable doubt: "(2) [t]he defendant was previously convicted of one (1) or more felonies, other than the present charge, whose statutory elements involve the use of violence to the person[,]" and "(3) [t]he defendant knowingly created a great risk of death to two (2) or more persons, other than the victim murdered, during the act of murder[.]" T.C.A. § 39-13-204(i)(2), (3) (2006). However, the jury found that the two statutory aggravating circumstances had not been proven by the state to outweigh any mitigating circumstances beyond a reasonable doubt, and consequently it sentenced Alexander to life imprisonment without the possibility of parole for the first degree felony murder conviction. See id. § 39-13-204(f)(2) (2006).

At the October 13, 2010 sentencing hearing for the remaining convictions, the State's only proof consisted of the presentence investigation report and certified copies of conviction for three robberies, one aggravated robbery, one theft of an automobile by taking, and one felony false imprisonment. After hearing arguments from counsel, the court sentenced Alexander to ten years as a Range II, multiple offender for the attempted aggravated robbery conviction (count one); forty years as a Range II, violent offender for the especially aggravated kidnapping conviction (count two); forty years as a Range II, violent offender for the second degree murder conviction (count three); forty years as a Range II, violent offender for the especially aggravated robbery conviction (count five); and four years as a Range II, multiple offender for the felony reckless endangerment conviction (count six). The trial court merged count three, the second degree murder conviction, with count four, the first degree felony murder conviction and ordered that counts one and six were concurrent with one another but consecutive to counts three and four. The court also ordered counts two and five to be served consecutively to the other counts for an effective sentence of life imprisonment without the possibility of parole plus ninety years.

Alexander subsequently filed a timely motion and amended motion for new trial, which were denied by the trial court. He then filed a timely notice of appeal.

## ANALYSIS

**I. Sufficiency of the Evidence.** Alexander argues that the evidence is insufficient to support his convictions. He specifically contends that there was insufficient evidence establishing his identity as the perpetrator of these offenses and argues that there was insufficient evidence supporting the attempted aggravated robbery conviction involving

-7-

victim Sean Mahoney. In response, the State contends that there was sufficient evidence to establish Alexander's identity as the perpetrator and to affirm the convictions in this case. We agree.

The State, on appeal, is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). When a defendant challenges the sufficiency of the evidence, the standard of review applied by this court is "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). Similarly, Rule 13(e) of the Tennessee Rules of Appellate Procedure states, "Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support a finding by the trier of fact of guilt beyond a reasonable doubt." Guilt may be found beyond a reasonable doubt in a case where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977); Farmer v. State, 343 S.W.2d 895, 897 (Tenn. 1961)). The trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and must reconcile all conflicts in the evidence. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). When reviewing issues regarding the sufficiency of the evidence, this court shall not "reweigh or reevaluate the evidence." Henley v. State, 960 S.W.2d 572, 578-79 (Tenn. 1997). This court has often stated that "[a] guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." Bland, 958 S.W.2d at 659. A guilty verdict also "removes the presumption of innocence and replaces it with a presumption of guilt, and the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id. (citing State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982)).

"In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence." State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (citing Duchac v. State, 505 S.W.2d 237, 241 (Tenn. 1973); Marable v. State, 313 S.W.2d 451, 456-58 (Tenn. 1958)). However, "[t]he jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting Marable, 313 S.W.2d at 457). This court may not substitute its inferences for those drawn by the trier of fact in cases involving circumstantial evidence. State v. Lewter, 313 S.W.3d 745, 748 (Tenn. 2010) (citing Liakas v. State, 286 S.W.2d 856, 859 (Tenn. 1956)). We note that the standard of review "'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Hanson, 279 S.W.3d 265, 275 (quoting State v. Sutton,

166 S.W.3d 686, 689 (Tenn. 2005)); Carruthers, 35 S.W.3d 516, 557 (Tenn. 2000). The court in Dorantes specifically adopted the standard for circumstantial evidence established by the United States Supreme Court in Holland:

> "Circumstantial evidence . . . is intrinsically no different from testimonial evidence. Admittedly, circumstantial evidence may in some cases point to a wholly incorrect result. Yet this is equally true of testimonial evidence. In both instances, a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference. In both, the jury must use its experience with people and events in weighing the probabilities. If the jury is convinced beyond a reasonable doubt, we can require no more."

Dorantes, 331 S.W.3d at 380 (quoting Holland v. United States, 348 U.S. 121, 140 (1954)).

First, Alexander argues that no eyewitnesses identified him as the perpetrator and no direct or circumstantial evidence connected him to the weapon, other than the fact that the coveralls and the earplug bearing his DNA were found in the same house as the weapon. Although he acknowledges that the DNA analysis showed that the pants and shoes recovered from the dumpster and the coveralls and the earplug recovered from the house on Maple Street belonged to him, he claims that there was no evidence connecting him to the crime scene other than the "varied accounts of the robber wearing a pair of coveralls and one witness'[s] testimony that the robber wore gloves."

"The identity of the perpetrator is an essential element of any crime." State v. Robert Wayne Pryor, No. M2003-02981-CCA-R3-CD, 2005 WL 901140, at *3 (Tenn. Crim. App., at Nashville, Apr. 19, 2005) (citing State v. Thompson, 519 S.W.2d 789, 793 (Tenn. 1975)). The State has the burden of proving "the identity of the defendant as the perpetrator beyond a reasonable doubt." Id. (citing State v. Sneed, 908 S.W.2d 408, 410 (Tenn. Crim. App. 1995)). The State may prove the perpetrator's identity using only circumstantial evidence. Rice, 184 S.W.3d at 662 (citing State v. Reid, 91 S.W.3d 247, 277 (Tenn. 2002)).

Here, although there were no eyewitnesses who identified Alexander as the perpetrator, the amount of circumstantial evidence supporting Alexander's convictions was overwhelming. We agree with the State's argument that the witnesses' descriptions of the perpetrator were consistent with Alexander's physical characteristics. Moreover, any minor inconsistencies in the eyewitnesses' testimony were resolved by the jury against Alexander. Alexander's van, whose hood was still warm, was parked near the side entrance of the restaurant. Alexander's work identification, driver's license, stocking mask, gloves, and earplugs were found inside his van. The police found a footprint on the other side of a fence

that separated the restaurant from North Maple Street. A trail of cash near this fence led the police to the house on North Maple Street, where they discovered footprints consistent with the footprint at the base of the fence. At this house, officers also found a pair of large, dark coveralls, an earplug, and a pair of gloves, which were the same type as those issued by Alexander's employer, International Paper. A short time later, a .22 caliber revolver was found in a closet at the house on North Maple Street. Alexander's girlfriend, Veronica Hines, stated she picked him up early on the morning of February 3, 2008, and took him to Leon Moton's house, where he changed clothes. Alexander later told Hines to tell the police that they were together at the time of the incident at O'Charley's, which she declined to do. Leon Moton admitted to the police that he had given Alexander a change of clothes and had thrown Alexander's old clothes in a dumpster near his house. Leon Moton also acknowledged that he drove Alexander to his sister's house in Smyrna and that he agreed to tell Alexander's wife that the reason Alexander did not come home the night of February 2, 2008 was because they had been gambling. Leon Moton later admitted to police that he never spent any time with Alexander the night of February 2, 2008 and did not pick up Alexander's wife at O'Charley's that night. The gunshot residue in the Dutch-style door at O'Charley's was consistent with someone firing a .22 caliber revolver into the door. The shoe prints at the house on North Main Street matched Alexander's shoes collected from the dumpster. The .22 caliber revolver found at that house contained two fired and six unfired cartridge cases. The bullet recovered from the restaurant and the bullet recovered from the victim had characteristics that were consistent with the .22 caliber revolver that was found. The two bullets recovered had the same caliber and rifling characteristics as bullets fired from a .22 caliber revolver. The pants and shoes retrieved from the dumpster as well as the coveralls and the gloves found at the house on North Maple Street all contained Alexander's DNA. Moreover, Alexander could not be excluded as the contributor to the partial DNA profile obtained from the earplug found in the pocket of the coveralls. Alexander's wife admitted that she never left the van at O'Charley's, and Veronica Hines admitted that she was not with Alexander at the time of the incident. Given the overwhelming circumstantial evidence in this case, it was reasonable for the jury to determine that Alexander was the perpetrator. As we previously stated, we will not "re-weigh or re-evaluate the evidence." Bland, 958 S.W.2d at 659.

Second, Alexander argues that the evidence is insufficient to support his conviction for attempted aggravated robbery. He contends that even if his statements that he was going to rob Mahoney and for Mahoney to get out of the car can be considered a substantial step regarding an aggravated robbery, there was no proof presented at trial that he intended to rob Mahoney. He asserts that before he learned whether Mahoney had any property on his person, he "changed courses" and decided to enter the restaurant.

As relevant here, aggravated robbery is the intentional or knowing theft of property of another by violence or putting the person in fear accomplished with a deadly weapon.

-10-

T.C.A. § 39-13-402(a)(1) (2006). As also relevant here, a person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense, acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense. Id. § 39-12-101(a)(3).

Alexander, who was wearing a blue ski mask and coveralls, knocked on Mahoney's car window. He demanded that Mahoney hang up the cell phone because he was robbing him. He then told Mahoney to get out of his car. When Mahoney refused to comply, Alexander brandished a .22 caliber revolver and told him, "Look at this gun. Do you think I'm joking now?" Mahoney said that he tried to keep Alexander "calm" because he was "scared." Alexander placed a gun to Mahoney's back and forced him to walk to the door to the kitchen. We conclude that Alexander's actions of informing Mahoney that he was robbing him, demanding that he get out of the car, brandishing a .22 caliber revolver when he refused to comply, and placing a gun to Mahoney's back constituted a substantial step in the commission of the aggravated robbery. See State v. Webster, 81 S.W.3d 244, 249 (Tenn. Crim. App. 2002) ("[T]he Defendant's conduct in approaching the victim and pointing a gun at the victim's head constituted a substantial step toward the commission of an especially aggravated robbery."); State v. Darrell Tywon Lockridge, No. M2008-01217-CCA-R3-CD, 2010 WL 652994, at *5 (Tenn. Crim. App., at Nashville, Feb. 24, 2010), perm. app. denied (Tenn. Aug. 26, 2010) (concluding that the defendant took a substantial step toward committing the aggravated robbery when he approached the victim, pointed a gun at him, and searched the victim's pockets and looked inside the victim's car); State v. Mark Anthony Griffin, No. E1999-00122-CCA-R3-CD, 2000 WL 1221873, at *2 (Tenn. Crim. App., at Knoxville, Aug. 29, 2000) (concluding that the defendant took a substantial step toward committing the robbery when the defendant "pointed a gun at the store clerk and demanded money" but the clerk was unable to open the cash drawer). Given the evidence presented at trial, we conclude that a rational jury could have determined that Alexander committed the offense of attempted aggravated robbery of Mahoney.

**II. Aggravating Circumstance.** Alexander argues that the evidence was insufficient to establish the aggravating circumstance that he "knowingly created a great risk of death to two (2) or more persons, other than the victim murdered, during the act of murder." T.C.A. § 39-13-204(i)(3). In response, the State contends that this aggravating circumstance was properly applied. We agree.

The Tennessee Supreme Court has held that "[a]ggravating circumstance (i)(3) 'contemplates either multiple murders or threats to several persons at or shortly prior to or shortly after an act of murder upon which the prosecution is based.'" State v. Burns, 979 S.W.2d 276, 280 (Tenn. 1998) (quoting State v. Cone, 665 S.W.2d 87, 95 (Tenn. 1984)).

-11-

This aggravating circumstance has been applied most commonly to situations in which a defendant fired several gunshots during a criminal offense where individuals other than the victim were present. Johnson v. State, 38 S.W.3d 52, 60 (Tenn. 2001) (citing State v. Henderson, 24 S.W.3d 307, 314 (Tenn. 2000)). Many cases have upheld the application of the (i)(3) aggravating circumstance where a defendant fired gunshots at a person or persons and other individuals were in the immediate area or nearby. Compare Henderson, 24 S.W.3d at 314 (concluding (i)(3) was present beyond a reasonable doubt where defendant and dentist struggled over gun before defendant fired first shot at deputy, which grazed him on the neck; at the time of the first shot, the dentist and dental assistant were in the room with the defendant, the receptionist was nearby, and expert testimony established that the bullet could have penetrated thin walls of office and traveled into other adjoining rooms in which patients were present), and Burns, 979 S.W.2d at 281 (concluding (i)(3) was present beyond a reasonable doubt where defendant fired handgun at four unarmed men inside a car, killing one and injuring another, before firing shots at one of the four men who fled, which endangered nearby bystanders who were playing basketball), with Johnson, 38 S.W.3d at 61 (concluding (i)(3) was not present beyond a reasonable doubt where the defendant's two shots at the manager "were fired at point-blank range, and no other person was within the immediate vicinity or within the line of fire" and "the stray bullet fired into the ceiling was [neither] an intentional shot fired by the appellee to intimidate the other customers [nor a] part of a random shooting spree"). Moreover, the Tennessee Supreme Court, in King v. State, 992 S.W.2d 946, 950-51 (Tenn. 1999), affirmed the application of the (i)(3) aggravating circumstance where the defendant fired a first shot into the ceiling of a crowded tavern, fired a second shot at the tavern owner, and held the patrons at gun point, where the circumstances of the offense indicated that there was a "very real" threat to the lives of the patrons.

Alexander argues that aggravating circumstance (i)(3) is most often applied to cases in which "a defendant fires multiple gunshots in the course of a robbery or other incident [in] which persons other than the victim are present." He claims that because the first bullet lodged in the door and the second bullet hit Bahmanziari, "it is factually impossible that two or more persons other than [Bahmanziari] were placed at great risk of death." However, as argued by the State, the evidence at trial established that there were two people, Mahoney and Dorton, in addition to victim Bahmanziari, who were inside the small office at the time that Alexander fired the two shots outside the door. Accordingly, we agree with the State and conclude that even though the second bullet lodged in the door, Alexander's "actions created a risk of death to [Mahoney and Dorton]."

**III. Sentencing.** Alexander contends that the trial court erred in imposing excessive sentences for each of his convictions and erred in ordering that his sentences be served

consecutively. In response, the State argues that the record supports the sentence in this case. We agree.

This case is governed by the 2005 amended sentencing act because all of the offenses occurred after the new sentencing act's effective date of June 7, 2005. See T.C.A. § 40-35-210 (2006), Compiler's Notes. Under the amended sentencing act, "the trial court 'shall consider, but is not bound by' an 'advisory sentencing guideline' that suggests an adjustment to the defendant's sentence upon the presence or absence of mitigating and enhancement factors." State v. Carter, 254 S.W.3d 335, 344 (Tenn. 2008) (quoting T.C.A. § 40-35-210(c)). Moreover, under the new law "[a]n appellate court is . . . bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." Id. at 346. The Tennessee Supreme Court explained the impact of the 2005 amended sentencing act:

> The amended statute no longer imposes a presumptive sentence. Rather, the trial court is free to select any sentence within the applicable range so long as the length of the sentence is "consistent with the purposes and principles of [the Sentencing Act]." Id. § 40-35-210(d). Those purposes and principles include "the imposition of a sentence justly deserved in relation to the seriousness of the offense," id. § 40-35-102(1), a punishment sufficient "to prevent crime and promote respect for the law," id. § 40-35-102(3), and consideration of a defendant's "potential or lack of potential for . . . rehabilitation," id. § 40-35-103(5).

Id. at 343 (internal footnote omitted). The court also emphasized the broad discretion the trial court has in sentencing a defendant under this act:

> [A] trial court's weighing of various mitigating and enhancement factors has been left to the trial court's sound discretion. Since the Sentencing Act has been revised to render these factors merely advisory, that discretion has been broadened. Thus, even if a trial court recognizes and enunciates several applicable enhancement factors, it does not abuse its discretion if it does not increase the sentence beyond the minimum on the basis of those factors. Similarly, if the trial court recognizes and enunciates several applicable mitigating factors, it does not abuse its discretion if it does not reduce the sentence from the maximum on the basis of those factors. The appellate courts are therefore left with a narrower set of circumstances in which they might find that a trial court has abused its discretion in setting the length of a defendant's sentence.

Id. at 345-46.

On appeal, we must review issues regarding the length and manner of service of a sentence de novo with a presumption that the trial court's determinations are correct. T.C.A. § 40-35-401(d) (2006). Nevertheless, "the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). This means that if the trial court followed the statutory sentencing procedure, made adequate findings of fact that are supported by the record, and gave due consideration and proper weight to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act, this court "may not disturb the sentence even if we would have preferred a different result." State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991). In a case where "the trial court applies inappropriate mitigating and/or enhancement factors or otherwise fails to follow the Sentencing Act, the presumption of correctness fails." Carter, 254 S.W.3d at 345 (citing State v. Shelton, 854 S.W.2d 116, 123 (Tenn. Crim. App. 1992)).

A trial court, when sentencing a defendant, must consider the following:

(1) The evidence, if any, received at the trial and the sentencing hearing;

(2) The presentence report;

(3) The principles of sentencing and arguments as to sentencing alternatives;

(4) The nature and characteristics of the criminal conduct involved;

(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;

(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and

(7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

T.C.A. § 40-35-210(b); see Carter, 254 S.W.3d at 343; State v. Hayes, 337 S.W.3d 235, 264 (Tenn. Crim. App. 2010). In addition, "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant should be considered in determining the sentence

alternative or length of a term to be imposed." T.C.A. § 40-35-103(5) (2006). The defendant has the burden of showing the impropriety of the sentence. See T.C.A. § 40-35-401(d), Sentencing Comm'n Comments.

**A. Length.** Alexander argues that the trial court imposed excessive sentences for his convictions for attempted aggravated robbery, especially aggravated kidnapping, especially aggravated robbery, and reckless endangerment committed with a deadly weapon. Specifically, he claims that the trial court failed to give "specific facts to support the use of these enhancement factors" and failed to "articulate the weight that he gave to the enhancement factors" before sentencing him at the top of the sentence range for each offense. The State responds that the trial court made appropriate findings regarding the enhancement factors and that the record supports the length of each of Alexander's sentences. We agree with the State.

The trial court applied the enhancement factor that [t]he defendant had "a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range" to all of Alexander's convictions. Id. § 40-35-114(1) (2006). For the convictions for especially aggravated kidnapping, especially aggravated robbery, and reckless endangerment, the trial court applied the enhancement factor that "[t]he offense involved more than one (1) victim[.]" Id. § 40-35-114(3) (2006). For the convictions for attempted aggravated robbery, especially aggravated kidnapping, and especially aggravated robbery, the trial court applied the enhancement factor that "[t]he defendant had no hesitation about committing a crime when the risk to human life was high[.]" Id. § 40-35-114(10) (2006). Finally, for the convictions for especially aggravated kidnapping and especially aggravated robbery, the trial court applied the enhancement factor that "[d]uring the commission of the felony, the defendant intentionally inflicted serious bodily injury upon another person, or the actions of the defendant resulted in the death of, or serious bodily injury to, a victim or a person other than the intended victim[.]" Id. § 40-35-114(12) (2006). The defense did not argue for and the court did not apply any statutory mitigation factors. See id. § 40-35-113 (2006).

The court properly applied enhancement factor (1) to all the convictions because Alexander had a criminal history that included prior felony convictions for possession of a controlled substance, aggravated robbery, theft of an automobile by taking, false imprisonment, and three convictions for robbery. The court also properly applied enhancement factors (3), (10), and (12) because Alexander put a gun to Mahoney's back and forced him to enter the restaurant. After Mahoney and Dorton were able to close themselves and Bahmanziari into the manager's office, Alexander hit or kicked the door in an attempt to open it and threatened to hurt the three men if they did not open the door and give him money. Alexander shot his .22 caliber revolver at the men inside the office twice, ultimately killing Bahmanziari. Upon review, the record supports the application of these enhancement

factors. Although Alexander argues that the trial court failed to make the appropriate findings regarding these enhancement factors, we conclude that the trial court made adequate findings of fact that were supported by the record for each of the enhancement factors.

Under the amended sentencing act, "[A] trial court's weighing of various mitigating and enhancement factors has been left to the trial court's sound discretion." Carter, 254 S.W.3d at 345. We conclude that the court's application of factors (1), (3), (10), and (12) was more than sufficient to enhance Alexander's sentences to the maximum sentence in the range for each of the challenged convictions.

**B. Consecutive Sentencing.** Alexander also contends that the trial court erred in imposing partial consecutive sentences that resulted in a ninety-year sentence consecutive to his sentence of life without the possibility of parole. Specifically, Alexander argues that the trial court failed to make the requisite additional findings required by State v. Wilkerson, 905 S.W.2d 933, 938 (Tenn.1995), in imposing partial consecutive sentences based on the dangerous offender factor. Although the State concedes that the trial court failed to make the requisite findings pursuant to Wilkerson regarding the dangerous offender factor, it argues that the trial court's imposition of partial consecutive sentences was proper based on the trial court's finding that Alexander was an offender whose record of criminal activity was extensive. See T.C.A. § 40-35-115(b)(2) (2006). We agree with the State.

Where a defendant is convicted of one or more offenses, the trial court has discretion to decide whether the sentences shall be served concurrently or consecutively. Id. § 40-35-115(a) (2006). A trial court may order multiple offenses to be served consecutively if it finds by a preponderance of the evidence that a defendant fits into at least one of the seven categories in code section 40-35-115(b) (2006). An order of consecutive sentencing must be "justly deserved in relation to the seriousness of the offense." Id. § 40-35-102(1) (2006). In addition, the length of a consecutive sentence must be "no greater than that deserved for the offense committed." Id. § 40-35-103(2).

Here, the trial court imposed consecutive sentencing because it determined that Alexander was "an offender whose record of criminal activity is extensive" and was "a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high." Id. § 40-35-115(b) (2), (4). The State concedes, and we agree, that the trial court failed to make the additional findings as required by Wilkerson that the partial consecutive sentences were "reasonably related to the severity of the offenses committed" and were "necessary in order to protect the public from further criminal acts by the offender." Wilkerson, 905 S.W.2d at 938.

This court has held that "[e]xtensive criminal history alone will support consecutive sentencing." State v. Adams, 973 S.W.2d 224, 231 (Tenn. Crim. App. 1997) (citing State v. Chrisman, 885 S.W.2d 834, 839 (Tenn. Crim. App. 1994)). Here, the presentence report showed that Alexander had prior felony convictions for possession of a Schedule II drug, aggravated robbery, theft of an automobile by taking, false imprisonment, and three convictions for robbery. At the sentencing hearing, Alexander never disputed his extensive criminal history. Moreover, the record shows that Alexander first committed a robbery offense when he was twenty years old, and he consistently engaged in criminal activity over the next twenty-eight years. We agree with the State that Alexander's prior convictions are serious and that his record of criminal activity is extensive. Although Alexander argues that the time between the convictions "should, [on] some level, mitigate the use of this sentencing factor in deciding whether [he] should receive consecutive sentences," we agree with the State that the amount of time between convictions, which for the most part corresponded to his periods of incarceration, merely underscores his "extensive and ongoing criminal conduct."

Accordingly, we conclude that the trial court did not abuse its discretion in imposing partial consecutive sentences. A finding of any one of the factors in section 40-35-115(b) can justify the trial court's imposition of consecutive sentencing, and the record shows that the trial court properly determined that Alexander was an offender "whose record of criminal activity is extensive." T.C.A. § 40-35-115(b)(2).

Upon review, we conclude that the sentence imposed by the trial court was proper. Alexander has failed to show the impropriety of his sentence.

## CONCLUSION

Upon review, we affirm the trial court's judgments.

_____
CAMILLE R. McMULLEN, JUDGE

-17-